**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **CAROL STEFAN, Executor of the Estate of Michael P. Reid,** | **Case No.  1:10 CV 671** |
| **Plaintiff,** | **Judge Dan Aaron Polster** |
| **vs.** | |
| **ED OLSON, et al.,** | **MEMORANDUM OF OPINION AND ORDER** |
| **Defendants.** | |

Pending before the Court are the following motions:

• Motion for Summary Judgment of Defendant Richland County ("Richland County's Motion") (**Doc #: 33**);

• Motion for Summary Judgment of the Individual Defendants Named in their Individual Capacities ("Individual Defendants' Motion") (**Doc #: 34**); and

• Plaintiff's Motion to Strike Section V(B) of Doc. 64, Defendants' Reply Memo ("Plaintiff's Motion to Strike) (**Doc #: 67**).

For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Richland County's Motion; **GRANTS IN PART** and **DENIES IN PART** the Individual Defendants' Motion; and **DENIES** Plaintiff's Motion to Strike.

## I.    BACKGROUND[1]

Throughout his adult life, Michael P. Reid ("Reid"), Plaintiff's decedent, suffered from alcoholism.  (Doc #: 1 ("Comp.") ¶ 18.)  A review of the Mansfield Municipal Court's Computerized Public Records shows that Reid was arrested numerous times for intoxication and intoxication-related offenses beginning in 1990, at the age of 18.[2]  The Records show that, on December 1, 2008, Reid was arrested for intoxication and resisting arrest, under Mansfield Municipal Court Case No. 2008 CRB 5558.  On February 3, 2009, he pled guilty to the resisting-arrest charge for which he was placed on one year of probation, and the intoxication charge was dismissed.  (Comp. ¶ 19.)  Mansfield Municipal Court Probation Officer ("P.O.") Martin E. Jones monitored Reid's probation.  (Id.)  As a condition of probation, Reid was ordered to attend Alcoholics Anonymous meetings and refrain from consuming alcohol.  (Id. ¶ 20.)  At this time, Reid lived with his parents.  (Id. ¶ 21.)

On February 17, 2009, Reid's mother, Susanne Reid (or "Mrs. Reid"), called P.O. Jones to advise him that Reid had started drinking again, and asked Jones to place him into a court-ordered alcohol treatment program.  (Comp. ¶ 22.)  Following this phone call, Jones apprised his supervisor, Tom Fultz, of the situation.  (Id. ¶ 23.)  Mr. Fultz instructed Jones to have Reid come to the Mansfield Municipal Court's probation office to meet with Mark Cox, the Coordinator of the Court Treatment Program.  (Id.)  On February 25, 2009, Reid was charged with Intoxication in violation of his probation, based upon Mrs. Reid's report to P.O. Jones.  (Id. ¶ 24.)  On March

---

[1]For purposes of the summary judgment motion only, the Court accepts as true the Plaintiff's factual allegations and draws all reasonable inferences in Plaintiff's favor.  *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).*

[2]See http://docket.webxsol.com/mansfield/index.html (search for "Reid, Michael P.").

4, 2009, Reid met with Jones and Mr. Cox.  (Id. ¶ 25.)  Reid admitted that his drinking "was

getting bad" and that he needed help to stop drinking.  (Id.; Jones Dep. at 35-36.)  At the

conclusion of the meeting, it was decided that Reid would be accepted back into the Court

Treatment Program, but he needed to stay sober to enter the program.  (Id.)

On March 6, 2009, however, Reid failed to report back for his probation violation

hearing.  (Comp. ¶ 26; Defts' Dep. Ex. 26 ("Probation Remarks"))  The Mansfield Municipal

Court issued a warrant for his arrest on a charge of Failure to Appear.  (Id.)  That same day, Reid

left his parents' house and continued drinking heavily.  (Id. ¶ 27; Probation Remarks.)  Between

March 6 and April 2, 2009, P.O. Jones received multiple phone calls from Reid's family

expressing concern about his spiraling alcohol use.  (Id. ¶ 28; Jones Dep. at 36-37.)

On April 2, 2009, prompted by a call from Mrs. Reid, P.O. Jones directed Mansfield

Municipal Court Probation Officers Darren Miller, Michael Kieffer, and Denise Stryker to arrest

Reid at his parents' home.  (Comp. ¶ 29; S. Reid Dep. at 12; Jones Dep. at 8; Probation

Remarks.)  He informed them that Reid was prone to having seizures when he stops drinking.

(Jones Dep. at 41-44.)

Officers Stryker, Keiffer and Miller arrested Reid without incident at his parents' home.

(Id.)  Reid admitted that he had been consuming alcohol all day and P.O. Kieffer administered a

blood alcohol test to Reid while transporting him to the jail.  (Comp. ¶¶ 30-31; Defts' Dep. Ex.

11 ("Kieffer Incident Report").)  The portable intoxilizer registered a blood alcohol level of

0.349, more than four times the legal limit for driving an automobile in the State of Ohio.

(Comp. ¶ 32; Kieffer Incident Report.)  Reid advised Miller, Kieffer and Stryker that he had a

history of seizures while withdrawing from alcohol, and asked them to make sure the jail staff

knew about his history.  (Comp. ¶ 36; Stryker Dep. 21-22; Defts' Dep. Ex. 12 ("Miller Incident Report") ("He just advised us to make sure that the medical staff at the jail knew that he occasionally did have a seizure when coming off of alcohol."); Keiffer Incident Report ("Mr. Reid advised that he has had a history of seizures while detoxing.  He told us several times to advise the jail staff of these issues.").)

Upon arrival at the jail, at approximately 6:22 p.m., the arresting probation officers advised corrections officers that Reid was highly intoxicated with a blood alcohol level of 0.349, and that Reid had a history of withdrawal seizures.  (Comp. ¶ 39; Defts' Dep. Ex. 9;  Stryker Dep. 21-22; Miller Incident Report ("After entering the Richland County Jail several correctional officers were advised that Mr. Reid was highly intoxicated and has severe medical problems while detoxing including seizuring.")); Keiffer Incident Report ("I advised a corrections officer that the defendant was highly intoxicated and says that he suffers from seizures."))  The initial reaction of Richland County Defendant Lieutenant James Myers and Defendant Nurse Jennifer McCune ("Nurse McCune") was not to accept Reid and have him transported to the hospital.  (Comp. ¶ 41; Defts' Dep. Ex. 10 ("Stryker Incident Report") ("The corrections officer stated that he would not keep [Reid] and then called for the jail nurse.  At first, the nurse said his pulse was racing; he was dehydrated and needed to go to the hospital.") Reid told Nurse McCune that he was drunk, he would go through withdrawal, he would have seizures upon withdrawal, and he "needed to go to the hospital."  (Defts' Dep. Ex. 4 ("McCune's Medical Progress Notes") at 1-2; Defts' Dep. Ex. 5 ("McCune Notes on McManama Report") at 1.)  Lt. Myers remembers Reid asking to go to the hospital several times.  (Myers Dep. at 39.)

-4-

At the time of Reid's detention, the Richland County Jail's Alcohol Withdrawal Protocol, established by the jail's medical director, Kenneth D. Williams, D.O., was in place:

> UPON INTAKE, IF AN INMATE IS *KNOWN TO BE AN ALCOHOLIC*, *VERBALLY STATES THEY ARE AN ALCOHOLIC*, OR ARE EXHIBITING SIGNS AND SYMPTOMS OF ALCOHOLIC WITHDRAWAL THE FOLLOWING PROTOCOL *WILL BE INITIATED* UPON EXAMINATION BY A NURSE.
> ASSESSMENT OF THE INMATE TO INCLUDE BASELINE VITALS TO INCLUDE BLOOD PRESSURE, PULSE, RESPIRATIONS, AND TEMP. HISTORY OF ALCOHOL AS STATED BY INMATE TO INCLUDE AMOUNT AND FREQUENCY, LENGTH OF TIME ALCOHOL CONSUMPTION OCCURRED (MONTHS/YEARS) CURRENT MEDICAL CONDITION IF EXHIBITING SIGNS AND SYMPTOMS OF WITHDRAWAL. ONCE ASSESSED THE FOLLOWING MEDICAL PROTOCOL IS APPLIED:
> MAG-OX 400MG 1 TAB ORALLY DAILY
> THIAMINE 100MG 1 TAB ORALLY DAILY
> VISTARIL 50MG 2 CAPSULES ORALLY TWICE DAILY X 7 DAYS
> ZANTAC 150MG 1 TAB ORALLY TWICE DAILY
> PHENERGAN 25MG 1 TAB ORALLY THREE TIMES DAILY X 3 DAYS
> LOPERAMIDE 2MG 1 CAPSULE ORALLY THREE TIMES DAILY X 3 DAYS
> CLONIDINE 0.1MG 1 TAB ORALLY TWICE DAILY
>
> <u>IF WITHDRAWAL IS SEVERE, FURTHER PROTOCOL UPON MEDICAL JUDGEMENT BY QUALIFIED MEDICAL PERSONEL:</u>
> LIBRIUM 25 MG
>     DAY 1: 2 CAPS PO Q 6HOURS IN 24 HOUR PERIOD
> SCHEDULE AT 0600, 1200, 1800, 2400
>     DAY 2: 1 CAP PO Q 6HOURS IN 24 HOUR PERIOD
> SCHEDULE AT 0600, 1200, 1800, 2400
>     DAY 3: 1 CAP PO Q 8HOURS IN 24 HOUR PERIOD
> SCHEDULE AT 0800, 1600, 2400
>     DAY 4: 1 CAP PO Q 12HOURS IN 24 HOUR PERIOD
> SCHEDULE AT 0800, 2000
>     <u>DAY 5: 1 CAP PO LAST DOSE GIVEN AT 0800</u>

(Williams Dep. at 134-35 (citing Defts' Dep Ex. 3, at 1) (emphasis added).)  Dr. Williams testified that, based on the language of the first paragraph (otherwise known as the "partial protocol"), the items listed therein should have been given to Reid within a reasonable period of

time:

> Q.     So under the policy that was in place at the Richland County Jail, which you developed and adopted, Michael Reid, according to this policy, should have been given each of these medications as soon as his assessment was done; is that correct?

> MR. DOWNEY:     Objection.  You can answer.

> A.     I would say within a reasonable time after the assessment was made.

> Q.     And when you say reasonable time, what do you think?

> A.     Well, I think certainly by the first hour he could have been given those medications.

(Williams Dep. at 137 (emphasis added).)  It was also Dr. Williams' understanding that the protocol medications were in stock at the jail.  (Id. at 138.)  Dr. Williams testified that it would be "impossible" to comply with the partial protocol if the medications were not in stock during the night shift, and the nurses had no discretion not to initiate the partial protocol within a reasonable period of time without contacting him to make an exception.  (Id. at 138-140.)  Dr. Williams also testified that the protocol set forth in the second paragraph of the Alcohol Withdrawal Protocol could not be administered without his consent.  (Id. at 141.)

The jail had records of Reid's withdrawal problems because he had been incarcerated there in the past.  Nurse Fogle testified that his computer records showed that the jail had administered two partial protocols on Reid during previous visits, and that one complete protocol was ordered but not administered because he was released.  (Fogle Dep. at 36.)  On a questionnaire filled out June 12, 1998, Reid answered YES to the question, "Have you ever experienced withdrawl [sic] symptoms when you stop drinking?"  (Comp. ¶ 63.)  A medical Receiving Screening Form dated November 17, 1998, documented that Reid had a history of

seizures.  (Comp. ¶ 64.)  A record entitled "Request Slip for Medical Care" dated August 12, 2002, documented that Reid reported to the Richland County Sheriff's personnel that he was in alcohol withdrawal following booking into jail that day.  (Id. ¶ 65.)  Reid described himself as an alcoholic who drank up to one full case of beer every day.  (Id. ¶ 66.)  In a Medical Screening record dated February 15, 2008, Reid's alcohol consumption was described as "CHRONIC," and stated that he drinks until he passes out.  (Id. ¶ 67.)

There is no evidence that Nurse McCune accessed any of Reid's medical records on the night of April 2, 2009.  After first deciding not to accept Reid, Nurse McCune took Reid's blood pressure, pulse and heart rate.  She deemed his vital signs to be in the normal range and left the decision whether to keep Reid at the jail to Lieutenant Myers' discretion while noting, "If we keep him, *he will go through withdrawal* ."  (McCune's Medical Progress Notes at 2 (emphasis added).)  Lt. Myers decided to accept Reid into the jail based on McCune's assessment that Reid was "stable."  (See Myers Dep. at 19, 28, 41.)  Nurse McCune initiated 30-minute checks on Reid and ordered that he have "a mat."[3] (McCune's Medical Progress Notes at 2.)

Corrections Officer Tina Mahon booked Reid into jail at 8:02 p.m., conducted a medical screening interview and ran a report at 8:12 p.m.  (Comp. ¶¶ 53-54.)  She documented in her report that Reid had "DT's (DELIRIUM TREMENS)."  (Id. ¶¶ 55-56; Defts' Dep. Ex. 1 at 1.)  Lieutenant Myers testified, however, that this report only indicates that Reid had suffered from DT's in the past. (Myers Dep. at 49-51.)  At 8:30 p.m., C.O. Mahon created an Incident Report

---

[3]Nurse McCune testified that Reid had "extra mats around him" as a "significant safety precaution[.]"  (McCune Dep. at 36.)  However, Nurse McCune's notes and the videotape of Reid's last minutes in the cell show that he had only one mat sitting on top of the concrete bed. (See also Myers Dep. at 64 (stating that there was only one mat in Reid's cell which is the same amount given to every inmate/detainee).)

directed to Lt. Myers stating, among other things, "Nurse Jen [McCune] also advised that she wanted Reid to be kept in 1B15 on 30 minute checks due to his high level of alcohol <u>and his seizures</u>."  (Defts' Dep. Ex. 13 ("Mahon Incident Report") at 1 (emphasis added).)  Cell 1B15 is a concrete cell block, comprised of cinder block walls, a concrete partition separating the toilet area, a concrete bed and a concrete floor.  (Comp. ¶ 59.)  It is also equipped with a video surveillance camera.  (Id.)  The only protective device Reid was given was the same mat provided to all detainees, which was placed on top of his concrete bed.

Before leaving for the night at 10 p.m., Nurse McCune checked on Reid once more. (McCune Notes on McManama Report at 1-2.)  Again, Reid reminded her, "[H]ey I will have seizures if I withdraw," to which she responded, "[W]e will take all precautions" including starting him "on meds."  (Id.)

Despite Nurse McCune's express assurances to Reid regarding access to the protocol medications and the written policy requiring their dispensation to him, the evidence shows that none of the partial protocol vitamins or medications were on hand to be given to Reid or any other highly intoxicated alcoholic detainee, no area pharmacies were open to get the protocol medications during the night, and the jail did not staff medical personnel during the night shift who were authorized to administer the medications.  (See Paxton Dep. 39, 111-114.)  Major Paxton testified that persons who needed withdrawal medications in the middle of the night would have to wait for a nurse to come in during the first (6:00 a.m.) shift, order the medications from a local pharmacy, and then wait for the medications to be delivered.  (Paxton Dep. at 111-113.)  Although the Alcohol Withdrawal Protocol required that vitamins and medications be administered upon notice that an intoxicated inmate was an alcoholic, and Dr. Williams testified

that they should have been administered to Reid within a reasonable time ("an hour"), the evidence shows that the jail's practice was <u>not</u> to dispense the partial protocol medications prophylactically.  (See Fogle Dep. at 29; McCune Dep. at 68.)  It is undisputed that Reid was never given any of the partial protocol vitamins or medications despite his expected withdrawal and his propensity for withdrawal seizures.

Dr. Williams testified that a proper alcohol withdrawal assessment requires that someone enter the cell every 30 minutes, interview the inmate about his or her withdrawal symptoms, examine the inmate and inspect the cell for evidence of withdrawal (e.g., vomitus).  (Williams Dep. at 130-32; see also Fogle Dep. at 34-35.)  Although there is evidence that officers "checked on" Reid throughout the night following Nurse McCune's departure, the record shows that those checks were cursory and inadequate by the jail medical director's standards.  Lt. Myers testified that the checks consisted only of looking through the window of Reid's cell in order to "[m]ake sure that [Reid was] breathing and not having any problems."  (Myers Dep. at 61; see also Stiteler Dep. at 32.)  When Reid asked Lt. Myers to take his blood pressure just before Myer's shift ended at 1:30 a.m., Lt. Myers responded that "the nurse would be in a couple hours to check him. " (Myers Dep. at 46.)  C.O. Stiteler and Collier testified that the Richland County Sheriff's Department had never provided either of them with training pertaining to alcohol withdrawal or taking vital signs.  (Stiteler Dep. at 9-10, 34; Collier Dep. at 22-23.)  C.O. Collier thought the alcohol withdrawal checks were no different from suicide checks, and that it was sufficient to glance at the video monitor to see if Reid was still breathing and not harming

-9-

himself.  (Collier Dep. at 25.)  C.O. Yankovich did not even know that Reid was supposed to be monitored for alcohol withdrawal.  (Yankovich Dep. at 23-24.)

Nurse Fogle began her shift at 5:15 a.m. on April 3.  She testified that it was her habit to access a detainee's records to see if he had been there before and what treatment he had received. (Fogle Dep. at 36.)  She accessed Reid's records at the beginning of her shift and saw that Reid had a documented history of alcohol abuse, that he had twice been on partial protocol during prior visits, and that a complete protocol had been ordered on one of his visits but was never initiated because he was released.  (Id.)  She testified that she would have to conduct a physical assessment to determine if a detainee was going through alcohol withdrawal (e.g., take vital signs, examine for severe diarrhea or vomiting, sweating, hallucinations).  (Id. at 34-35.) Nonetheless, she did not enter Reid's cell to conduct a physical assessment after having glanced at the video monitor a few times and observed him sleeping.

C.O. McManama entered Reid's cell at 6:00 a.m. and 6:45 a.m. to deliver and pick up his breakfast tray.  She did not report to Nurse Fogle that Reid complained of nausea and had not eaten.  McManama testified that she did not know what the phrase "alcohol withdrawal assessment" meant when asked at deposition and said she had never been trained to recognize the signs or symptoms of alcohol withdrawal.  (McManama Dep. at 19)  She had also never been trained to take vital signs prior to April 3.  (See id. at 21-22.)  McManama was familiar with Reid and his alcoholism.  (Id. at 43 ("there's a handful of [repeat offenders] that are known alcoholics, and he's one of them.").)  She had previously monitored Reid while he was on alcohol withdrawal watch at the jail in the past.  (McManama Dep. at 12-16.)  Thus, with the exception of Officer McManama who entered Reid's cell only to deliver and pick up his

-10-

breakfast tray, no one entered Reid's cell to conduct a physical assessment of him between 10:00

p.m., when Nurse McCune's shift ended, until his collapse at 8:29 a.m. the next morning (more

than three hours after Nurse Fogle began her shift).  At approximately 7 a.m., Reid's sister,

Melissa Reid, called the jail and spoke with Officer Huey Smith.  (Comp. ¶ 76.)  The phone

conversation was recorded.  Melissa advised Smith, "I just want to check on [Reid] because he

has serious medical issues because of his alcoholism."  She warned, "I just want you guys to

make sure you keep a close eye on him because he will, he'll seizure [sic] out.  He really will."

(Id.)  Officer Smith checked the computer, saw that Reid was in the observation cell and did not

report the call to anyone.  (Smith Dep. at 8-9.)

At 8:29 a.m., Reid stood up in his cell and pressed the buzzer several times to request

assistance.  (Comp. ¶ 78; Videotape.)  While waiting for assistance, he suffered a violent seizure

and smacked his head against the concrete bed ("it sounded like a shot gun, it made so much

noise" - Defts' Dep. Ex. 7, D. Fogle Medical Progress Notes reporting C.O. Hicks description),

creating an open head injury with cerebral herniation, multiple hematomas and contusions.  (Id.

¶ 79; See also Geier Report at 19 (Michael Reid had "a life-threatening alcohol withdrawal

seizure"); Videotape.)  The mat on the bed provided no protection whatsoever.  (Videotape.)

Nurse Fogle was called to respond to this injury, making it the first time during her shift that she

entered Reid's cell.  (See Fogle Dep. at 67.)  At some point after entering Reid's cell, Fogle

noticed white vomit in Reid's toilet.  (Id. at 83.)  She later testified that if she had received a call

at home from someone at the jail informing her that Reid was vomiting, she would have "gotten

up and physically come in" since, combined with his high blood-alcohol level, that would be a

sign or symptom that he might be starting withdrawal.  (Id. at 54-56.)  According to Fogle, once

-11-

alcohol withdrawal begins, "they can deteriorate rapidly."  (Id. at 57.)  Regardless, no one knows

when Reid vomited because no one entered the cell to conduct a proper assessment in the more

than ten hours after Nurse McCune's shift concluded – and, except for the few minutes before

Reid had his seizure, the surveillance tape which documented Reid over these ten hours was

erased by Major Paxton following Mrs. Reid's two separate demands for it (see below).  Reid

was taken by ambulance to MedCentral Health System Mansfield Hospital.  A blood test showed

that Reid's blood-alcohol level dropped over 71% in the twelve hours he was incarcerated, to

0.099.  (Comp. ¶ 84.)  Reid underwent an emergency craniectomy.  (Id. ¶ 87.)  On April 8, 2009,

Reid was pronounced brain dead and removed from life support.  (Id. ¶ 88.)

Meanwhile, on April 3, 2009, after Susanne Reid learned that her son had been taken to

the hospital, she proceeded to the jail and demanded to see the videotape from Reid's

observation cell.  (S. Reid Dep. at 58-59.)  Corrections officers told her she "would never see the

video."  (Id.)  Consequently, Mrs. Reid retained counsel who faxed a letter marked "URGENT"

to Sheriff Sheldon and the County Prosecutor on April 8, 2010, requesting the entire video under

Ohio's Open Records law.  (See Defts' Dep. Ex. 28.)  Although the Sheriff has a policy of

keeping video for seven days, he responded by sending a letter enclosing videotape of only the

last minutes leading up to Reid's seizure and fatal fall.  Thus, despite inconsistencies between

the 30-minute logs and the testimony of various Defendants, Major Paxton erased ten hours

worth of surveillance tape documenting those ten hours of Reid's incarceration.

Based on these factual allegations, Plaintiff filed a complaint asserting deliberate

indifference to Reid's medical needs in violation of the United States Constitution (Count I);

unconstitutional custom (Count II); failure to train (Count III); medical negligence (Count IV);

-12-

and wrongful death (Count V).  The Individual Defendants have filed a summary judgment

motion (Doc #: 34) and the County has filed a summary judgment motion (Doc #: 33).  The

Plaintiff has filed a single brief in opposition to both motions.  (Doc #: 61.)  The Individual

Defendants and the County have filed reply briefs.  (Respectively, Doc ##: 64, 65.)  Upon the

Court's solicitation, Plaintiff filed a sur-reply brief on the subject of Monnell liability through a

policy of inaction.  (Doc #: 70.)  After reviewing the sur-reply, the Court directed Defendants to

produce, no later than 4:00 p.m. on June 22, 2011, answers to all of Plaintiff's interrogatories

requesting information regarding treatment of inmates.  (Doc #: 71.)  Defendants filed a Motion

for Reconsideration and/or for Clarification of the Court's order.  (Doc #: 73).  Plaintiff filed a

response brief and Defendants a reply.  (Respectively, Doc ##: 74, 75.)  The Court held a

teleconference with counsel on June 23, 2011 and again on June 28, 2011.  Following these

teleconferences, the Court concluded that any further discovery with regard to the treatment of

inmates going through withdrawal would be "overly burdensome" and "unduly prolong" the

case.  (Doc #: 76)  The Court also made note that if Plaintiff had "truly wanted or needed"

answers to these interrogatories, she should have pursued them within the specified discovery

time frame.  (Id.)

    The Court has reviewed the briefs, the exhibits and the entire record and is prepared to

issue its ruling.

## II.    STANDARD OF REVIEW

    Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." FED. R. CIV. P. 56(c).  All facts and inferences drawn therefrom must be viewed in a light most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 403 (6th Cir. 1997).  If, after reviewing the record as a whole, a rational factfinder could not find for the nonmoving party, summary judgment is appropriate since there is no genuine issue of material fact for determination at trial.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III.    FEDERAL CLAIM - DELIBERATE  INDIFFERENCE

#### A.    Applicable Law

Congress enacted 42 U.S.C. § 1983 to provide compensation to individuals who suffer the deprivation of a federal right at the hands of persons exercising state power.  *Butler v. Coltsville Tp. Police Dep't*, 93 F.Supp.2d 862 (N.D. Ohio 2000).  To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived him of a right secured by the Constitution or laws of the United States.  *Id*. (citing *Black v. Barberton Citizens Hosp.*, 134 F.3d 1265, 1267 (6th Cir. 1998)).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Phillips v. Roane County, Tennessee*, 534 F.3d 531, 538 (6th Cir. 2008) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In determining whether the government officials are entitled to qualified immunity, the Court must answer two questions: (1) viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation occurred, and (2) was the right clearly established at the

time of the violation.  *Id.* (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)).

While qualified immunity is available for the defendants in their individual capacities, it does not

protect municipalities.  *See, e.g.*, *Jones v. Upper Arlington*, No. 92-3154, 1993 U.S. App. LEXIS

3508, at *10 (6th Cir. Feb. 19, 1993).

     Plaintiff brings a § 1983 deliberate indifference claim against the County and its

employees in their individual and official capacities.  The Eighth Amendment prohibition against

cruel and unusual punishment generally provides the basis upon which to assert a claim for

deliberate indifference to serious medical needs of prisoners.  *Meier v. County of Presque Isle*,

376 Fed. Appx. 524, 528 (6th Cir. 2010).  Where that claim is brought on behalf of a pre-trial

detainee as opposed to a prisoner, as here, the Due Process Clause of the Fourteenth Amendment

is the proper starting point for the Court's analysis.  *Id.* (citing *City of Revere v. Mass Gen.*

*Hosp.*, 463 U.S. 239, 244 (1983).  Importantly, "the due process rights of a [pre-trial detainee]

are at least as great as the Eighth Amendment protections available to a convicted prisoner."  *Id*.

Under either Amendment, the test for deliberate indifference includes both objective and

subjective components, for which the plaintiff bears the burden.  *Id*. (citing *Phillips v. Roane*

*County*, 534 F.3d 531, 539 (6th Cir. 2008) and *Watkins v. City of Battle Creek*, 273 F.3d 682,

685-86 (6th Cir. 2001)).

     "The objective component requires a plaintiff to demonstrate 'the existence of a

sufficiently serious medical need.'"  *Meier*, 376 Fed. Appx. at 528 (quoting *Harrison v. Ash*, 539

F.3d 510, 518 (6th Cir. 2008)).  To determine whether such a serious medical needed existed, a

two-part inquiry is necessary:

     A reviewing court should first determine whether the injury was 'obvious,' i.e.
     'One that has been diagnosed by a physician as mandating treatment *or* one that is

-15-

> so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'  If there is an obvious need for medical treatment, then the court must determine whether the delay in securing that care was reasonable.  If, however, the injury is not apparent, or relatively minor, . . . a plaintiff must provide 'medical evidence' demonstrating that the delay in treatment resulted in additional injury.

*Cain v. Irvin*, 286 Fed. Appx. 920, 927 (6th Cir. 2008) (citing *Blackmore v. Kalamazoo County*, 390 F.3d 863, 897, 899-900 (6th Cir. 2004)) (emphasis added).

The subjective component requires a plaintiff to "allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded the risk."  *Id*. (citing *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).  "Officials, of course, do not readily admit this subjective component, so 'it [is] permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge.'"  *Phillips v. Roane County, Tennessee*, 534 F.3d 531, 540 (6th Cir. 2008) (*Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

Importantly, it is not enough to show that a defendant acted negligently in response to a known risk.  *Id*. (citing *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)).  On the other hand, a plaintiff need not show that the defendant acted with the intent to cause harm.  *Comstock*, 273 F.3d at 703.  Rather, "'deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.'"  *Comstock*, 273 F.3d at 703 (quoting *Farmer*, 511 U.S. at 836).

C.  **Liability of Individual Defendants**

1.  **Objective Component**

There is sufficient evidence from which a jury could find the objective component of a deliberate indifference claim, i.e., the existence of a serious medical condition requiring medical attention.  Contrary to the Defendants' characterization of this case, it is decidedly not "a simple case of an inebriated arrestee who tragically, but unexpectedly, suffered a seizure and fell, striking his head, hours after being booked in jail."  (Reply at 1.)  Nor is it factually analogous to *Meier v. County of Presque Isle*, 376 Fed. Appx. 524 (6th Cir. 2010), a case Defendants deem "remarkably similar."  (Id. at 5.)  In *Meier*, a police officer picked up a drunk driver (Shaun Meier) after he drove his car into a ditch, through a fence and fled the scene.  Based on Meier's comportment and behavior, admission of drinking and failure to pass field sobriety tests, the arresting officer charged him with operating a vehicle while under the influence of alcohol and driving with a suspended license.  Meier's blood alcohol content, measured at the jail, registered 0.31.  The only information the officers had about Meier when he came to the jail was that he was drunk and his own observation that he experiences "slight shaking" when he stops drinking.

Here, the three arresting officers notified Lt. Myers and Nurse McCune upon Reid's arrival that he had a blood-alcohol content of 0.349 and a history of seizures following alcohol withdrawal.  Reid himself told Nurse McCune that he was an alcoholic, that he would go through withdrawal, and that he had a history of seizures upon withdrawal.  If she had checked his records, she would have seen that he was administered partial protocol medications during two earlier detentions, was ordered (but not administered) one complete protocol during an earlier

-17-

detention, and previously reported a history of withdrawal seizures.  (See Comp. ¶¶ 63-67; Fogle Dep. at 35-37.)

It is not even clear after reviewing the briefs whether Defendants dispute that Reid had a serious medical condition.  If there is any question about this element, however, the jail's then-medical director, Dr. Kenneth D. Williams, testified that a highly intoxicated inmate with a history of withdrawal seizures has a serious medical need.  (Williams Dep. 80:4-12.)  And Plaintiff's expert, Peter J. Geier, M.D., reports that a history of alcohol withdrawal seizures in the context of a high blood-alcohol level and a tolerance to alcohol, represents a medical emergency requiring intensive monitoring and treatment.  (Doc #: 61-1 ("Geier Report") at 18.)

Based on the foregoing, the Court finds that Plaintiff has produced evidence from which a jury could conclude that an "obvious" medical condition existed which even a "lay person" would understand as requiring medical attention, and that the delay in treating such condition presented a serious, and in this case fatal, risk to Michael Reid's health.  *Cain*, 286 Fed. Appx. at 927.  As such, the Court finds that Plaintiff can satisfy the objective prong of the test for individual deliberate indifference.

### 2.  Subjective Component

Although Plaintiff has sued numerous individual defendants, she clarifies in the Opposition Brief that her federal claims are only against five individuals: Nurses McCune and Fogle, Lt. Myers, and Corrections Officers Mahon and Smith.  (See Doc #: 61 at 29-32, 29, n. 4.)

### a.  Nurse McCune

Based on the evidence presented by Plaintiff, a reasonable juror could conclude that Nurse McCune was aware of a substantial risk to Michael Reid, drew the inference and

-18-

disregarded the risk.  At 6:22 p.m. on April 2, the three arresting officers told Nurse McCune that Reid had a high blood alcohol content and a history of withdrawal seizures.  (Defts' Dep. Ex. 9.)   Her notes reflect that Reid told her he was an alcoholic, he would go through withdrawal, he would have seizures, and he needed to go to the hospital.  (McCune's Medical Progress Notes at 2.)  He asked to be taken to the hospital several times.  McCune's notes reflect that she assured Reid she would be there for him and they would provide medications should he go through withdrawal.  (McCune Notes on McManama Report at 1-2.)  She said this knowing that there were no protocol medications at the jail, they had to be ordered from a pharmacy, there was no way to get the medications at night, they could not be dispensed by anyone but a medical professional, and there was no medical professional at the jail on the night shift.  McCune testified that she ordered multiple mats as a "significant safety precaution" should he fall. (McCune Dep. at 36.)  However, her notes show that she ordered "a mat," and the videotape and testimony of other defendants show that there was only one mat in the cell sitting on top of Reid's concrete bed.  (McCune's Medical Progress Notes at 2; Video.)  A reasonable juror could also conclude that, had McCune checked Reid's records, she would have seen that Reid had been administered the partial protocol medications on two previous occasions (not to mention a complete protocol that was ordered but never administered), and that he had a documented history of withdrawal seizures.

Under the circumstances, a reasonable juror could find that placing Reid in an all-concrete cell with one mat, knowing that he had a blood alcohol content of 0.349, knowing that he would not be drinking any alcohol for the next 10 to 12 hours, knowing that he would go through withdrawal, knowing that he had a history of withdrawal seizures, knowing that there

-19-

would be no protocol medications at the jail and no one who could dispense them in any event, shows deliberate indifference to a known risk.  There is evidence from which a jury could conclude that Nurse McCune made the decision to accept Reid at the jail, rather than directing the arresting officers to take Reid directly to the hospital, knowing that the jail had neither the medication nor the overnight personnel to follow the jail's own protocol to treat Reid.  These facts, along with the testimony of the jail's Medical Director, Dr. Williams, could support a finding of deliberate indifference.

The Court also finds that Nurse McCune is not entitled to qualified immunity.  A government official is not entitled to qualified immunity when, in their official capacity, they cause a clearly established right of an individual to be violated.  *See Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).  Viewing the facts in the light most favorable to the plaintiff, a jury could find that McCune violated Michael Reid's Eighth Amendment right to adequate medical treatment.  This was a clearly established right in April of 2009.  *See Estelle v. Gamble*, 42 U.S. 87, 104-05 (1976) ("Deliberate indifference by prison personnel to a prisoner's serious illness or injury constitutes cruel and unusual punishment contravening the Eighth Amendment.").  Therefore, Nurse McCune is not entitled to qualified immunity and the Court **DENIES** Individual Defendants' Motion insofar as it pertains to Nurse McCune's deliberate indifference.

### b.     Nurse Fogle

Plaintiff has failed to present evidence from which a reasonable juror could conclude that Nurse Fogle's actions rose to the level of deliberate indifference towards Michael Reid's rights.  What sets Nurse Fogle apart from Nurse McCune is that she did not "subjectively perceive[]

-20-

facts from which to infer substantial risk to [Michael Reid]." *Phillips*, 534 F.3d at 540 (citing *Comstock*, 273 F.3d at 703). There is no evidence that Nurse McCune ever informed Fogle that Reid was an alcoholic who suffered from withdrawal seizures or that he had asked to be taken to a hospital. Though Fogle did testify that she became aware of Reid's history of alcohol abuse when she came to the jail on the morning of April 3, she also stated that "I did not see anything that jumped out at me and said that he had been on the complete [alcohol withdrawal] protocol." (Fogle Dep. at 36.) Nurse Fogle also testified that "[f]rom the time that Nurse [McCune] called me the evening before, I had no reason, no basis for considering him in full-blown withdrawal . . . . To my knowledge, he does not have a seizure disorder." (Id. at 87, 102-03.)

Though Nurse Fogle may well have been negligent for failing to examine Reid immediately upon arrival at the jail, she stated that the only reason she did not do so was because Reid was sleeping. (See id. at 101.) There is no evidence that Lieutenant Myers informed Fogle that Reid asked to have his blood pressure taken at around 1:30 a.m., and there is no evidence that anyone informed her that Reid had vomited sometime during the night or early morning. (Id. at 83, 88-89.)

Based on the aforementioned facts, a reasonable juror could not conclude that Nurse Fogle had the subjective perception of a substantial risk to Michael Reid that is required for a finding of deliberate indifference. As such, the Court **GRANTS** Individual Defendants' Motion insofar as it applies to Nurse Fogle.

### c. Lieutenant Myers

Plaintiff has also not produced sufficient evidence that Lieutenant Myers was deliberately indifferent towards the rights of Michael Reid. Plaintiff has produced evidence demonstrating

that Myers "subjectively perceived facts from which to infer substantial risk to [Michael Reid]."

*Phillips*, 534 F.3d  at 540 (citing *Comstock*, 273 F.3d at 703).  Myers testified that Reid's 0.349

BAC "immediately kind of threw a red flag up . . ." and that "he might have a serious medical

need[.]"  (Myers Dep. at 18, 22.)  However, the evidence shows that Myers did not disregard this

risk.  He recognized that he needed to have Reid "cleared by medical [before admitting him to

the jail]" and contacted Nurse McCune.  (Id. at 18.)  Upon assessment, McCune "said [Reid]

could be accepted."  (Id. at 19.)  Myers testified that "I was going to tell [the probation officers]

they needed to take [Reid] to the hospital[,] . . . [but] I was going off of [Nurse McCune's]

assessment as far as initial intake . . . . [O]nce she said he was stable, then I decided to accept

him."  (Id. at 24, 28, 41.)  It was not unreasonable for Lieutenant Myers, once he acknowledged

that Reid potentially needed to go to the hospital, to seek assistance from a trained medical

professional and then accept that medical professional's conclusion that Reid was "stable" and

thus fit to be accepted into the jail.  (Myers Dep. at  41.)  Also, there is no evidence that from the

time Reid was accepted into the jail at 8:02 p.m., until the time that Myers left the jail at

approximately 1:30 a.m., that Reid exhibited any signs that a medically-untrained corrections

officer such as Myers should have recognized as a serious medical problem.  Though Myers may

have been inadequately trained with regard to monitoring inmates at risk for alcohol withdrawal,

that is an issue regarding the County's liability and has no bearing on Lieutenant Myers'

individual liability.  As such, the Court **GRANTS** Individual Defendants' Motion insofar as it

pertains to Lieutenant Myers.

### d.    Corrections Officer Mahon

Based upon the evidence presented, a reasonable juror could not find that Corrections Officer Mahon was deliberately indifferent toward Michael Reid's rights.  Officer Mahon began her shift at the Richland County Jail at 2 p.m. on April 2 and left at approximately 10 p.m., less than two hours after Reid was admitted to the jail.  Mahon played no role in the decision of whether to admit Reid to the jail and was under the direct supervision of Lieutenant Myers once Reid was admitted.  As noted above, there is no evidence that from the time Reid was accepted into the jail, until the time that Mahon left the jail at approximately 10 p.m., that Reid exhibited any signs that a medically-untrained corrections officer such as Mahon should have recognized as a serious medical problem -- especially after a medical professional indicated that Reid was "stable."  (Myers Dep. at 41.)  There is no evidence from which a reasonable juror could conclude that Officer Mahon was subjectively aware of a substantial risk to Michael Reid, and thus no evidence that she disregarded such a risk.  As such, the Court **GRANTS** Individual Defendants' motion insofar as it pertains to Corrections Officer Mahon.

### e.    Corrections Officer Smith

Finally, there is insufficient evidence for a reasonable juror to conclude that Corrections Officer Smith was deliberately indifferent towards Michael Reid's rights.  The only relation Officer Smith has to this case is that at approximately 7 a.m. on the morning of April 3, 2009, he was working in Control Room 5, which was on a different floor than the area in which Reid was detained, and received a phone call from Michael Reid's sister.  (Smith Dep. at 4-5.)  During that conversation, Reid's sister advised Smith "that her brother would quote-unquote seize out or

quote-unquote DT really bad[.]" (Id. at 6.)  Smith did not pass Ms. Reid's warning on to his supervisor.

Though the evidence does indicate that Smith "subjectively perceived facts from which to infer substantial risk to [Michael Reid]," it does not demonstrate that he recklessly disregarded that risk.  *Phillips*, 534 F.3d at 540 (citing *Comstock*, 273 F.3d at 703).  Rather, Smith checked his computer and saw that Reid was already being monitored for alcohol withdrawal.  While the Court does not necessarily agree with Officer Smith's decision not to notify his supervisor of Ms. Reid's phone call, the Court does find that Smith's decision not to pass it on was based on a rational, though sadly incorrect, assumption that since Reid was on alcohol withdrawal watch that the risk for withdrawal seizures had already been adequately addressed.  Accordingly, the Court finds that no reasonable juror could conclude that Corrections Officer Smith was deliberately indifferent towards Michael Reid's rights and thus **GRANTS** Individual Defendants' Motion insofar as it pertains to Corrections Officer Smith.

### C.  Municipal Liability

#### 1.  Policy of Inaction

Richland County moves for summary judgment on the ground that the County does not have a custom or policy that violated Plaintiff's constitutional rights under 42 U.S.C. §1983.  The Court finds that Plaintiff has not produced evidence from which a reasonable juror could conclude that Richland County is liable for deliberate indifference towards Michael Reid's rights through an unconstitutional policy or custom.

Under 42 U.S.C. § 1983,

[Any] person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person . . . to the

> deprivation of any rights, privileges, or immunities secured by the Constitution of
> the United States, shall, [notwithstanding] any such law, statute, ordinance,
> regulation, custom, or usage of the State to the contrary,. . . be liable to the party
> injured in any action at law, suit in equity, or other proper proceeding for
> redress .  . . .

42 U.S.C. § 1983 (2011).  The Supreme Court has made clear that § 1983 "plainly imposes liability on a government that, under color of some official policy, causes an employee to violate another's constitutional rights."  *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658, 692 (1978) (internal quotation marks omitted).  In order to determine whether a government or  municipality is liable for a § 1983 violation, a two-part test is applied.  First, a plaintiff must show that he suffered a constitutional violation at the hands of a municipal official. *See Blackmore*, 390 F.3d 890.  If an underlying constitutional violation exists, a municipality is liable for that violation if the plaintiff can show that "the municipality engaged in a 'policy or custom' that was the 'moving force' behind the deprivation of the plaintiff's rights."  *Powers v. Hamilton County Pub. Defender Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007) (citing *Monell*, 436 U.S. at 694).  However, a government cannot be held liable for a § 1983 violation under a theory of *respondeat superior*.  *See Monell*, 436 U.S. at 691.  Rather, municipal liability only attaches under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury. . ." *Monell*,  436 U.S. at 694.  Thus, a municipality can only be held responsible for the decisions of municipal officers who possess "final authority to establish municipal policy. . . [because such decisions] surely [represent] an act of official government 'policy' as that term is commonly understood."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986), citing *Monell* at 694.

The Sixth Circuit has added to the second prong of the above test when the alleged unconstitutional policy or custom is one of inaction.  In order for a municipality to be liable for deliberate indifference towards an individual's Eighth Amendment right to adequate medical treatment through a policy or custom of inaction, the plaintiff has the burden of satisfying a four-part test.  He must show:

(1)     a clear and persistent pattern of mishandled medical emergencies for pre-arraignment detainees;

(2)     [the County had] notice, or constructive notice of such pattern;

(3)     tacit approval of the deliberate indifference and failure to act amounting to an official policy of inaction [by the county]; and

(4)     that the custom or policy of inaction was the moving force, or direct causal link, behind the constitutional injury.

*Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005) (internal quotation marks omitted) (citing *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)).[4]  The Sixth Circuit has made clear that a custom of failing to provide adequate medical treatment to pretrial

---

[4]The Court thinks it important to note that this test is more stringent than the tests for municipal liability in some other circuits.  *See, e.g.*, *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175 (9th Cir. 2002) ("As long as a jury can infer that the policymakers knew that their policy of not screening certain incoming detainees would pose a risk to someone in [decedent's] situation, we must reverse the summary judgment in favor of the County.").  However, the Sixth Circuit is not alone in placing a high burden on plaintiffs in § 1983 actions.  *See, e.g.*, *Thelma D. v. Board of Educ. Of City of St. Louis*, 934 F,2s 929, 932-33 (8th Cir. 1991) (stating that in order to establish a governmental custom of failing to act upon and investigate constitutional violations a plaintiff must prove, among other things, "[t]he existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees").  In fact, both this Eighth Circuit test and the Sixth Circuit's test for customs of inaction cited *supra*, originate from *Monell*, which stated "Congress included customs and usages [in § 1983] because of the *persistent* and widespread discriminatory practices of state officials . . . .  Although not authorized by written law, such practices of state officials could well be so permanent and well settles as to constitute a custom or usage with the force of law."  *Monell*, 436 U.S. at 691 (emphasis added) (alteration in original) (internal quotation marks omitted).

-26-

detainees is one of inaction.  *See, e.g.*, *Miller v. Calhoun County*, 408 F.3d 803 (6th Cir. 2005) (holding that jail's failure to provide adequate medical treatment to pretrial detainees constituted a custom of inaction).  As such, since Plaintiff is alleging that Richland County Jail had a custom of not providing pretrial detainees like Michael Reid with adequate medical treatment, Sixth Circuit case law requires her to satisfy the four-part test outlined in *Garretson* and *Claiborne County*, *supra*.

Plaintiff has presented ample evidence of customs at the Richland County Jail which served to deprive Michael Reid of his constitutional rights on the night of April 2, 2009 and the morning of April 3, 2009, the most significant example being the jail's custom of not following the written alcohol withdrawal protocol established by Dr. Williams.  Had the jail followed this protocol, Reid likely would have received adequate medical treatment, thus averting the seizure that ultimately led to his death.  Plaintiff, however, has provided no evidence of  "a clear and persistent pattern of mishandled medical emergencies for pre-arraignment detainees" by the Richland County Jail.  *Garretson*, 407 F.3d at 796 (citing *Claiborne County*, 103 F.3d at 508). After months of discovery, there is no evidence that anything like what happened to Reid has happened to any other inmate at the jail.  As such, Plaintiff is unable to satisfy the first part of the test laid out in *Garretson*, *supra*, and thus cannot prove that Richland County is liable for the Richland County Jail's unconstitutional custom of inaction.  Therefore, Richland County's Motion as it pertains to the deprivation of Michael Reid's rights through a municipal custom of inaction is hereby **GRANTED**.

### 2.    Failure to Train

Richland County also moves for summary judgment on the ground that they adequately trained all personnel working at the Richland County Jail the night of April 2, 2009 and the morning of April 3, 2009.  The Court finds that Plaintiff has produced evidence from which a reasonable juror could conclude that Richland County failed to adequately train its employees and such failure led to a deprivation of Michael Reid's rights.  To succeed on a failure to train claim, "the plaintiff must prove . . . [1.] that the training program at issue is inadequate to the tasks that officers must perform; [2.] that the inadequacy is the result of the city's deliberate indifference; and [3.] that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." *Russo v. Cincinnati*, 953 F.2d 1036, 1046 (6th Circuit 1992) (citation omitted).

The holding of *Russo* is directly applicable to the unconstitutional failure to train question in the immediate case.  After laying out the three-part test outlined *supra*, the *Russo* court applied it to Russo's allegations that the city's failure to train its police officers how to properly deal with mentally-ill persons led to the shooting and death of her mentally-ill brother. Ultimately, the *Russo* court held that a genuine issue of material fact existed as to whether the city had unconstitutionally failed to train its police officers.  In coming to this ruling, the court relied on three pieces of evidence:

> 1. "[O]fficers conceded that they were frequently called upon to deal with mentally and emotionally disturbed and disabled individuals, [but] none were able to give specific responses as to the content of their training." *Id*. at 1046.
>
> 2. A municipal investigation report which concluded that: "recruit training regarding the mentally ill appears inadequate, in-service training is virtually non-existent and. . . there are no procedures or methods for interviewing mentally ill individuals or techniques for recognizing the mentally ill." *Id*.
>
> 3. The expert testimony of a doctor, who noted that, "none of the involved police

-28-

personnel understood the appropriate procedures for reacting to mentally ill
individuals, . . . a failing which must inevitably be linked to deficient training."

*Id.* at 1047 (alteration in original).

For reasons similar to those laid out in *Russo*, Plaintiff has presented enough evidence to

create a genuine issue of material fact as to whether Richland County is liable for the death of

Michael Reid as the result of failing to adequately train the employees of the Richland County

Jail on how to deal with inmates going through alcohol withdrawal.  First, Plaintiff has presented

evidence which brings into question whether the training of Richland County corrections officers

"was inadequate for the tasks [they] were required to perform."  *Id.* at 1046.  Although

corrections officers were required to monitor inmates like Reid for alcohol withdrawal

(especially during the night shift when no medical personnel were scheduled), the jail spent *no*

money on training its corrections officers on how to deal with 1) intoxicated inmates, 2) alcohol

withdrawal, 3) recognizing the signs and the symptoms of alcohol withdrawal or 4) assessing

inmates at risk for seizures.  (See Paxton Dep. 87:1-15; Myers Dep. at 10-11; Stiteler Dep. at 9-

10; Collier Dep. at 22-23; McManama Dep. at 19-22.)  Officer McManama, who worked from 6

a.m. until the time of Reid's seizure, did not even know what "alcohol withdrawal assessment"

meant when asked at deposition.  (McManama Dep. at 19)  In addition, although Major Paxton

recognized alcohol withdrawal was a serious problem that the jail faced and Dr. Williams told

Major Paxton that "a huge gap in care" existed during the jail's night shift, Major Paxton did

nothing to better train jail corrections officers.  (Doc #: 61 at 18; see also Williams Dep. at 81,

85-87.)

Plaintiff has also presented evidence from which a reasonable juror could conclude that

the training of Richland County Jail's medical staff "was inadequate for the tasks [they] were

-29-

required to perform," i.e., administering Dr. Williams' alcohol withdrawal protocol.  *Russo*, 953 F.2d at 1046.  Though the protocol required inmates like Reid to be provided with medicine, neither Nurse McCune nor Nurse Fogle provided Reid with medication.  In fact, both Nurses testified that it was the jail's practice not to treat highly intoxicated alcoholic detainees prophylactically, even though the official policy put in place by Dr. Williams did call for prophylactic treatment.  (Compare McCune Dep. at 68 and Fogle Dep. at 29, with Williams Dep. at 137-38.)  At deposition, Nurse McCune was not even sure what the jail's official withdrawal policy was.  (See McCune Dep. at 76-77.)

Second, Plaintiff has presented evidence which creates a genuine issue of material fact as to whether this inadequate training was "the result of the city's deliberate indifference."  *Russo*, 953 F.2d at 1046.  Sheriff Sheldon and Major Paxton each recognized that alcohol withdrawal was a serious problem the jail faced but did nothing to train jail staff on how to handle that problem.  (See Sheldon Dep. 15:6-9; Paxton Dep. 40:25-41:3.)  Since the decisions of these two men represent official Richland County policy, deliberate indifference on their part is equivalent to deliberate indifference on the part of the county.  *See Pembaur*, 475 U.S. at 481 and *supra*.  As such, evidence that Sheriff Sheldon and Major Paxton recognized a serious problem the jail faced and failed to address it creates a question of material fact as to whether these two men (and thus the county) were deliberately indifferent to the rights of inmates like Michael Reid who were going through alcohol withdrawal.

Finally, Plaintiff has presented evidence which creates a genuine issue of material fact as to whether inadequate training "was closely related to [Michael Reid's] injury."  *Russo* at 1046.  Both Dr. Williams and Nurse Fogle testified that it was necessary to physically enter an inmate's

-30-

cell to determine whether that inmate was going through alcohol withdrawal.  (See Williams Dep. at 130-32 ("Q. Would you agree with me that in order to effectively assess [each of the withdrawal symptoms] the person doing the assessment would need to be able to interact with the inmate, to talk to them? . . . A. Yes Q. Would you also have expected that someone conducting such an assessment of the inmate might check the toilet to see if they've thrown up? . . . A. Yes, sir."); Fogle Dep. at 29-30 ("I would look at what's in front of me, meaning their physical condition, their vital signs."))  Despite this, corrections staff thought it adequate to simply peer into Reid's cell to "[m]ake sure that [he was] breathing and not having any problems."  (Myers Dep. at 61; see also Stiteler Dep. at 32 (30-minute checks consisted of "going to the window [of the cell]").)  Nurse Fogle testified that if she had been informed that Reid had vomited (i.e., if an officer had gone into Reid's cell and checked for vomit), she would have "checked on and reassessed [Reid] . . . again[.]"  Fogle Dep. at 83.  Based on this evidence, a reasonable juror could conclude that, had prison staff been adequately trained in how to deal with and assess alcohol withdrawal, Reid would have been reassessed by Nurse Fogle prior to his seizure and might not have had the seizure which caused his fatal head injury.  As such, Plaintiff has presented evidence sufficient to create genuine issues of material fact as to each of the three parts of the test for unconstitutional failure to train outlined in *Russo*.  Therefore, Richland County's Motion with regard to deprivation of Michael Reid's rights through an unconstitutional failure to train is hereby **DENIED**.

-31-

**IV.     STATE LAW CLAIMS**: **MEDICAL NEGLIGENCE AND WRONGFUL DEATH**

**A.     Applicable Law**

Plaintiff brings a claim of medical negligence against Nurse McCune, Nurse Fogle and Dr. Williams.  "As with negligence claims in general, liability based on the alleged negligence of a medical professional requires proof of (1) a duty running from the defendant to the plaintiff, (2) the defendant's breach of that duty, (3) damages sustained by the plaintiff, and (4) proximate causation of the damages by the defendant's breach of duty." *Loudin v. Radiology & Imaging Servs.*, No. 2010-0297, 2011 Ohio LEXIS 965, at **9, *P13 (Ohio Apr. 20, 2011) (citing *Schirmer v. Mt. Auburn Obstetrics & Gynecologic Assocs, Inc.*, 844 N.E.2d 1160 at ¶ 17 (Ohio 2006 (citation omitted))).

Plaintiff also brings a wrongful death claim against the County and its employees in their individual and official capacities.  Section 2125.01 of the Ohio Revised Code provides that "when the death of a person is caused by wrongful [sic] act, neglect, or default which would have entitled the party injured to maintain an action and recover damages if death had not ensued, the corporation which or the person who would have been liable if death had not ensued, or the administrator or executor of the estate of such person, as such administrator or executor, shall be liable to an action for damages, notwithstanding the death of the person injured . . . ."

Section 2744.03(A) of the Ohio Revised Code states that an employee of a political subdivision has immunity from suits seeking "to recover damages for injury, death or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function."  The operation of a jail is a governmental function.  See O.R.C. 2744.01(C)(2)(h) (the definition of "[g]overnmental function" includes "operation of jails . . .").

An employee is not immune, however, if "the employee's actions or omissions are [a.] manifestly outside the scope of employment or the employee's official responsibilities, [b.] the employee's acts or omissions were malicious, in bad faith, or wanton or reckless, or [c.] liability is expressly imposed upon the employee by a section of the Revised Code." *Rankin v. Cuyahoga County Dep't of Children & Family Servs.*, 889 N.E.2d 521 (Ohio 2008); *see also* O.R.C. 2744.03(A)(6)(a), (b), and (c). "Wanton and reckless" behavior is characterized by the actor's perverse disregard for a known risk. *Rankin*, 889 N.E.2d at 527.

### B.    Individual Liability

#### 1.    Nurse McCune

As explained above in the federal claims section, Plaintiff has produced evidence from which a reasonable juror could conclude that Nurse McCune was deliberately indifferent to Michael Reid's rights.  The Sixth Circuit has noted in the past that "[d]eliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of *recklessly* disregarding that risk." *Comstock*, 273 F.3d at 703 (emphasis added).  As such, the Court finds that if evidence exists from which a reasonable juror could conclude that McCune was deliberately indifferent, a reasonable juror could also find from the same evidence that McCune acted recklessly.  Thus, sufficient evidence exists from which a reasonable juror could conclude that Nurse McCune is not entitled to state immunity because she acted recklessly.  *See* O.R.C. 2744.03(A)(6)(b) (denying state officials immunity if their actions are "wanton or *reckless*.") (emphasis added); *see also Theobald v. Univ. of Cincinnati*, 111 Ohio St. 3d 541, 544 (Ohio 2006) ("A [state] health-care practitioner . . . is potentially immune from liability for medical [negligence] . . .

[u]nless he or she acted with malicious purpose, in bad faith, or in a wanton or *reckless* manner . . . .") (emphasis added).

Without state immunity, a reasonable juror could conclude that Nurse McCune is liable for both medical negligence and wrongful death.  Plaintiff has produced sufficient evidence for her medical negligence claim to survive summary judgment: 1) McCune owed a duty to Reid due to their nurse-patient relationship; 2) McCune breached this duty by recklessly disregarding Reid's serious medical need; 3) this breach caused Reid to have a withdrawal seizure in a concrete cell, hit his head, and ultimately pass away; and 4) this breach was the proximate cause of Reid's injury and death.  It is foreseeable that placing a known alcoholic with a 0.349 BAC and a history of withdrawal seizures in a concrete cell with a concrete bed and not providing him with medicine to treat withdrawal could result in serious injury.  Based on this evidence, a reasonable juror could also conclude that Nurse McCune is liable for the wrongful death of Michael Reid because her "wrongful act" (her medical negligence) led to the death of Michael Reid.  Therefore, Individual Defendants' Motion is **DENIED** insofar as it pertains to the state claims against Nurse McCune.

### 2. Nurse Fogle, Lieutenant Myers, Corrections Officer Mahon, and Corrections Officer Smith

Plaintiff brings suit against Nurse Fogle for medical negligence and wrongful death and against Lieutenant Myers, Corrections Officer Mahon and Corrections Officer Smith for wrongful death.  Defendants allege that they are all immune from such claims under O.R.C. 2744.03(A) because none of the bases for stripping immunity found in O.R.C. 2744(A)(6)(a), (b) and (c) exist here.  (Individual Defendants' Motion at 11-12.)  For reasons similar to those cited

in the federal claims section, the Court finds that there is no evidence that Defendants Fogle,
Myers, Mahon and Smith acted "outside the scope of [their] employment or official
responsibilities," that they acted with "malicious purpose, in bad faith, or in a wanton or reckless
manner," and there is no other section of the Ohio Revised Code which imputes liability onto
them in this case.  O.R.C. 2744(A)(6)(a), (b) and (c).  As such, Nurse Fogle, Lieutenant Myers,
Corrections Officer Mahon, and Corrections Officer Smith are immune from the Plaintiff's state
claims under O.R.C. 2744.03(A).  Therefore, Individual Defendants' Motion as it pertains to the
state claims against Nurse Fogle, Lieutenant Myers, Corrections Officer Mahon, and Corrections
Officer Smith defendants is **GRANTED**.

> **3.** **Ed Olson, Gary Utt, Tim Wert, Sheriff Sheldon, and Major Paxton**

Plaintiff also alleges that Ed Olson, Gary Utt, Tim Wert, Sheriff Sheldon, and Major
Paxton are liable for Michael Reid's wrongful death.  Defendants allege that they are all immune
from such claims under O.R.C. 2744.03(A) because none of the bases for stripping immunity
found in O.R.C. 2744(A)(6)(a), (b) and (c) exist here.  (Individual Defendants' Motion at 11-12.)
The Court agrees with Defendants.  Olson, Utt, Wert, Sheldon and Paxton did not act "outside
the scope of [their] employment or official responsibilities," none of them even knew who
Michael Reid was until after his injury the morning of April 3, 2009, and thus could not possibly
have had the subjective state of mind necessary for a finding of "[w]anton and reckless"
behavior, and there are no other sections of the Ohio Revised Code which impute liability onto
them in this case.  O.R.C. 2744(A)(6)(a), (b) and (c).  As such, Ed Olson, Gary Utt, Tim Wert,
Sheriff Sheldon, and Major Paxton are immune from Plaintiff's state law claims and  Individual

Defendants' Motion is **GRANTED** insofar as it pertains to the state claims against Defendants Olson, Utt, Wert, Sheldon and Paxton.

### 4.    Dr. Williams

Finally, Plaintiff brings suit against Dr. Williams for medical negligence and wrongful death.  The Court finds that Plaintiff has not produced evidence from which a reasonable juror could conclude that Dr. Williams is liable for these claims.  As a preliminary matter, Plaintiff is correct in pointing out that Dr. Williams was an independent contractor and as such is not entitled to immunity under O.R.C. 2744.03(A) because independent contractors are not considered state employees under O.R.C. 2744.  See O.R.C. 2744.01(B) ("'Employee' does not include an independent contractor . . . .").  However, even without the benefit of immunity, Dr. Williams cannot be found liable for medical negligence because Michael Reid was never his patient.  As noted above, in order for a medical professional to be liable for medical negligence, there must exist "a duty running from the defendant to the plaintiff."  *Loudin*, , 2011 Ohio LEXIS 965 at *\*9, \*P13* (citing *Schirmer*, 844 N.E.2d 1160 at ¶ 17).  Dr. Williams never met Michael Reid and did not even know who Reid was until long after Reid's accident on April 3.  As such, no patient-doctor relationship existed between Williams and Reid that could trigger medical negligence liability for Dr. Williams.

Plaintiff has moved to strike the argument that no patient-doctor relationship existed between Williams and Reid because Defendants did not raise it in their initial motion.  Though the Court generally agrees with Plaintiff's contention that "[c]ourts should not consider arguments and evidence introduced for the first time in a reply brief, because to do so, denies the

-36-

opponent any opportunity to respond,"[5] this principle is not applicable to the case at hand.  No relationship ever existed between Dr. Williams and Michael Reid.  As such, Plaintiff would be unable to establish a prima facie case of medical negligence at trial.  The Court will not permit an unfounded claim to go forward simply because Defendant failed to point out the lack of a patient-doctor relationship in its initial motion.  Accordingly, the Court **DENIES** Plaintiff's Motion to Strike.

Since Dr. Williams cannot possibly be liable for medical negligence, and also because he was not present at the Richland County Jail on April 2 and 3, 2009, the Court also holds that no reasonable juror could find that Dr. Williams is liable for the wrongful death of Michael Reid.  As such, Individual Defendants' Motion is **GRANTED** insofar as it pertains to the state law claims against Dr. Williams.

## V.      CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the Individual Defendants' Motion (**Doc #: 34**) except as it pertains to the deliberate indifference, medical negligence and wrongful death claims against Nurse Jennifer McCune, for which summary judgment is **DENIED**.  The Court **GRANTS** Richland County's Motion (**Doc #: 33**) except as it pertains to the failure to train claim, for which summary judgment is **DENIED**.  The Court **DENIES** Plaintiff's Motion to Strike (**Doc #: 67**).

---

[5] Doc #: 67 ("Plaintiff's Motion to Strike") at 2 (citing *Reed v. Freebird Film Prods., Inc.*, 2009 Dist. LEXIS 87219 (N.D. Ohio), at *9-10 (citing *Rush v. Illinois Central R.R. Co.*, 399 F.3d 705, 727 n.19 (6th Cir. 2005)).

**IT IS SO ORDERED.**

*/s/ Dan A. Polster    July 5, 2011*
**Dan Aaron Polster**
**United States District Judge**